# In the United States Court of Federal Claims

No. 10-503 C

(Filed: March 31, 2011)

```
*************************************
JAMES RICHARD, SR., et al.,            *
                                       *   Motion to Dismiss; RCFC 12(b)(1);
              Plaintiffs,              *   Fort Laramie Treaty of April 29, 1868;
                                       *   "Bad Men" Clause; Peace Commission;
v.                                     *   "Wrong" Committed by an Individual Not
                                       *   Affiliated With the United States; Treaty
THE UNITED STATES,                     *   Interpretation; Hebah; Begay; Tsosie; Elk;
                                       *   Zephier; Hernandez; Slattery; Jan's
              Defendant.               *   Helicopter Service, Inc.
                                       *
*************************************
```

Terry L. Pechota, Rapid City, SD, for plaintiffs.

J. Hunter Bennett, United States Department of Justice, Washington, DC, for defendant.  Alice Peterson, United States Department of the Interior, of counsel.

**OPINION AND ORDER**

**SWEENEY**, Judge

      Before the court is defendant's motion to dismiss.  In this case, plaintiffs, the purported personal representatives of the estates of Calonnie D. Randall and Robert J. Whirlwind Horse, invoke the relevant "bad men" clause contained in Article I of the Fort Laramie Treaty of April 29, 1868 ("Fort Laramie Treaty") and seek money damages stemming from the deaths of their adult children.  Defendant moves to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), contending that plaintiffs have failed to allege that the individual responsible for their children's deaths was an agent or employee of the United States.  Alternatively, defendant moves to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6) because, it argues, the "wrong" that occurred in this case falls outside the type of "wrong" contemplated by the "bad men" clause.  For the reasons set forth below, the court lacks subject matter jurisdiction over the complaint and grants defendant's motion to dismiss pursuant to RCFC 12(b)(1).

## I. BACKGROUND

Ms. Randall and Mr. Whirlwind Horse were members of the Oglala Sioux Tribe. Compl. ¶ 16. On August 27, 2008, they were struck and killed by a vehicle while walking along a highway within the Pine Ridge Indian Reservation in Shannon County, South Dakota. Id. ¶ 6. The driver of the vehicle, a "non-Indian" named Timothy Hotz, was intoxicated at the time of the incident. Id. ¶¶ 7-8. After the incident, Mr. Hotz fled the scene but was eventually arrested. Id. ¶ 8. He pled guilty to involuntary manslaughter in the United States District Court for the District of South Dakota and has been serving a fifty-one month prison sentence.[1] Id. ¶ 9.

Plaintiffs filed an administrative claim with the United States Department of the Interior ("Interior"). Id. ¶ 14; see also id. ¶ 21 (alleging that plaintiffs submitted a claim for damages to the Assistant Secretary of Indian Affairs in Washington, DC). As of August 2, 2010, the date on which they filed a complaint in the United States Court of Federal Claims ("Court of Federal Claims"), plaintiffs' administrative claim was neither granted nor denied. Id. ¶¶ 14, 21. In their complaint, plaintiffs allege that Ms. Randall and Mr. Whirlwind Horse, as members of the Oglala Sioux Tribe, were beneficiaries under the Fort Laramie Treaty. Id. ¶ 16. The relevant "bad men" provision in the Fort Laramie Treaty, plaintiffs assert, requires that the United States, among other things, reimburse an injured person for losses sustained as a result of the acts of "bad men." Id. ¶ 17. Plaintiffs allege that Mr. Hotz's conduct, which caused the deaths of Ms. Randall and Mr. Whirlwind Horse, constituted a "wrong" committed against Native Americans and therefore rendered Mr. Hotz a "bad man" under the Fort Laramie Treaty. Id. ¶¶ 19-20. Plaintiffs claim that they suffered losses of, among other things, income, companionship, and love, and incurred medical expenses, burial expenses, and other damages as a result of the deaths of Ms. Randall and Mr. Whirlwind Horse. Id. ¶ 13. Plaintiffs seek an award of $3,000,000 for both estates, plus costs, attorney's fees, and any other relief permitted under the Fort Laramie Treaty. Id. Prayer for Relief.

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case"). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power

---

[1] Mr. Hotz is also subject to three years of supervised release. See United States v. Hotz, No. 5:08-CR-50094-001 (D.S.D. Mar. 31, 2009) (order entering judgment in a criminal case). He must pay restitution in the amount of $1,700 to the Department of Social Services Victims Compensation Services and amounts to be determined to the families of Ms. Randall and Mr. Whirlwind Horse. Id.

to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).

The Tucker Act waives sovereign immunity "for any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."[2] 28 U.S.C. § 1491(a)(1). Not every claim is cognizable under the Tucker Act because the claim must be for money damages against the United States. King, 395 U.S. at 2-3. Furthermore, the Tucker Act "is not available when the breaching entity is not part of the federal government or not acting as its agent, or when jurisdiction has been explicitly disclaimed." Slattery v. United States, Nos. 2007-5063, -5064, -5089, 2011 WL 257841, at *9 n.3 (Fed. Cir. Jan. 28, 2011) (en banc); see also Agee v. United States, 72 Fed. Cl. 284, 288 (2006) ("The United States is not liable for the actions of non-federal parties who are not agents of the United States." (citing Brazos Elec. Power Coop. v. U.S. Dep't of Agric., 144 F.3d 784, 787 (Fed. Cir. 1998))).

As a jurisdictional statute, the Tucker Act "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S.

---

[2] A separate statute, the Indian Tucker Act, confers jurisdiction upon the Court of Federal Claims to hear claims by Native American tribes pursuant to a treaty:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505 (2006). The Indian Tucker Act, however, applies only to tribal plaintiffs and not individual tribal members. See Fields v. United States, 423 F.2d 380, 383 (Ct. Cl. 1970) ("[S]ince the instant case is one brought by individual Indians and not a tribe, band, or identifiable group of Indians, we feel that defendant is correct in asserting that section 1505 does not apply to the present case."). Therefore, the Indian Tucker Act cannot serve as a basis for jurisdiction in this case.

392, 398 (1976). Therefore, a plaintiff must identify a separate money-mandating source that, if violated, provides for a claim for damages against the United States. James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998); see also Harvest Inst. Freedman Fed'n v. United States, 80 Fed. Cl. 197, 200 (2008) ("To be money-mandating, a statute, regulation, or treaty must impose a specific obligation on the party of the Government."). Furthermore, a "grant of a right of action must be made with specificity." Testan, 424 U.S. at 400.

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has explained:

> In determining whether the Court of Federal Claims has jurisdiction, all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source. There is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits.

Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008); see also Ralston Steel Corp. v. United States, 340 F.2d 663, 667-68 (Ct. Cl. 1965) (holding that "a claimant who says he is entitled to money from the United States because a statute or a regulation grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous, but arguable"). A treaty with a Native American tribe is a contract. Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675 (1979). The Federal Circuit and its predecessor court, the United States Court of Claims ("Court of Claims"), have found Tucker Act jurisdiction over certain claims brought under Article I "bad men" clauses in treaties similar to the Fort Laramie Treaty. See Tsosie v. United States, 825 F.2d 393 (Fed. Cir. 1987); Begay v. United States, 219 Ct. Cl. 599 (1979); Hebah v. United States, 428 F.2d 1334 (Ct. Cl. 1970).

### B. Motion to Dismiss

Defendant moves to dismiss the complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) or, in the alternative, for failure to state a claim upon which relief can be granted under RCFC 12(b)(6). When deciding a motion to dismiss based upon either ground, the court assumes all factual allegations are true and draws all reasonable inferences in the plaintiff's favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006). The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). The burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936); see also Reynolds v. Army & Air Force Exch. Serv.,

846 F.2d 746, 748 (Fed. Cir. 1988) (providing that jurisdiction must be established by a preponderance of the evidence). If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. When ruling upon a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. Matthews, 72 Fed. Cl. at 278; see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### C. The "Bad Men" Clause of the Fort Laramie Treaty

Armed conflict between Native Americans and settlers moving westward across the North American continent is well-documented throughout the annals of American history. These so-called Indian Wars, which were conducted with no formal declaration of war by Congress against Native American tribes, required the use of military force and "sufficient[ly] . . . constitute[d] a state of war." Montoya v. United States, 180 U.S. 261, 267 (1901) (citing Marks v. United States, 161 U.S. 297 (1896)). Although the United States and Native American tribes executed numerous treaties, hostilities persisted. Resentment among Native Americans toward the United States intensified in the 1860s when the military increased its presence across the Great Plains. Starley Talbott, Fort Laramie 8 (2010). Consequently, the state of war between tribes and American settlers and soldiers intensified. See id.

The Fort Laramie Treaty, "one of nine [treaties] made in 1868[] by and between commissioners representing the United States and chiefs of various previously hostile Indian tribes,"[3] Tsosie, 825 F.2d at 395, has been described as "the foundational document of today's Sioux nations," William P. Zuger, A Baedeker to the Tribal Court, 83 N.D. L. Rev. 55, 61 (2007). "[C]oncluded at the culmination of the Powder River War of 1866-1867, a series of military engagements in which the Sioux tribes, led by their great chief, Red Cloud, fought to protect the integrity of earlier-recognized treaty lands from the incursion of white settlers," United States v. Sioux Nation of Indians, 448 U.S. 371, 394 (1980), the Fort Laramie Treaty was

---

[3] Congress established a Peace Commission comprised of civilians and military officers "to investigate the cause of the war and to arrange for peace . . . ." Report of the Commissioner of Indian Affairs, in Annual Report of the Commissioner of Indian Affairs for the Year 1868 ("1868 Annual Report") 1, 4 (1868). The Peace Commission "call[ed] together the chiefs and headmen of such bands of Indians as were then waging war, for the purpose of ascertaining their reasons for hostility, and, if thought advisable, to make treaties with them . . . ." Report to the President by the Indian Peace Commission, January 7, 1868, in 1868 Annual Report, supra, at 26, 26.

5

"comprehensive both in terms and purpose,"[4] Brown v. United States, 32 Ct. Cl. 411, 414 (1897). Article I of the Fort Laramie Treaty provides:

> From this day forward all war between the parties to this agreement shall forever cease.  The government of the United States desires peace, and its honor is hereby pledged to keep it.  The Indians desire peace, and they now pledge their honor to maintain it.
>
> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington city, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.
>
> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do so, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.  And the President, on advising with the Commissioner of Indian Affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper.  But no one sustaining loss while violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor.

15 Stat. at 635-36.  The Fort Laramie Treaty, like the other treaties entered into with Native American tribes in 1868, contains two "bad men" clauses.  Article I, as indicated above,

---

[4] For example, Article II of the treaty established what was known as the Great Sioux Reservation, which consisted of approximately sixty-million acres in portions of present-day South Dakota and North Dakota, see Treaty Between the United States of America and Different Tribes of Sioux Indians, 15 Stat. 635, 636 (1868); Brian Sawers, Tribal Land Corporations: Using Incorporation to Combat Fractionation, 88 Neb. L. Rev. 385, 413 (2009), and Article VI established an English education system for Native American children, see 15 Stat. at 637-38; see also Sioux Nation of Indians, 448 U.S. at 374-76 (recounting several agreements included in the Fort Laramie Treaty); Report of the Commissioner of Indian Affairs, supra note 3, at 4 (explaining that the "main features of these several treaties are: the binding the Indians, parties thereto, to keep the peace, the providing for the several tribes a suitable reservation, and the means for their education and civilization").

"provid[es] on the one hand for wrongs committed by white persons against Indians, and on the other hand, by Indians against white men . . . ." Brown, 32 Ct. Cl. at 414.  One "bad men" clause "deals with liability of the treaty tribe for depredation by its members, and purports to improve the tribe's position by giving it an escape hatch from its liability as it would otherwise be," while the other "bad men" clause "deals with an entirely separate matter, wrongs by the white side's 'bad men' against a treaty tribe, and purports to give the tribe or a wronged member reimbursement from the federal treasury."  Tsosie, 825 F.3d at 398.  "Together, the purpose served by the two 'bad men' provisions working in concert was to keep the peace between the white men and the Indians."  Garreaux v. United States, 77 Fed. Cl. 726, 736 (2007) (citing Janis v. United States, 32 Ct. Cl. 407, 410 (1897)).  Indeed, one of the primary objectives of the Fort Laramie Treaty was to encourage Native Americans to "treat[] crime as crime . . . ."  Brown, 32 Ct. Cl. at 415.  Although the Fort Laramie Treaty was negotiated between and ratified by the United States and the Sioux Nation, individual Native Americans are third-party contractual beneficiaries who have "legal rights to vindicate and enforce the Federal Government's promise."  Hebah, 428 F.2d at 1338.

The first "bad men" clause of the Fort Laramie Treaty "contains a number of requisites which plaintiff has the burden of proving."  Hebah v. United States, 456 F.2d 696, 704 (Ct. Cl. 1972).  First, the plaintiff must show that "bad men among the whites, or among other people subject to the authority of the United States" committed a "wrong upon the person or property of the Indians."  15 Stat. at 635.  Second, the plaintiff must show the amount needed to "reimburse" for any "loss sustained."  Id.

### III.  DISCUSSION

Plaintiffs assert that the Court of Federal Claims possesses jurisdiction over their complaint based upon the first "bad men" clause contained in Article I of the Fort Laramie Treaty.  In order to bring an action against the United States under the Fort Laramie Treaty, "a Native American must be a victim of an affirmative criminal act, and the person committing the act must be a specific white man or men."  Hernandez v. United States, 93 Fed. Cl. 193, 200 (2010) (citing Ex parte Kan-gi-shun-ca, 109 U.S. 556, 567 (1883)).  Defendant asserts that the court lacks jurisdiction over plaintiffs' claim because plaintiffs fail to allege that Mr. Hotz, a private citizen, was an employee or agent of the United States at the time of the incident involving Ms. Randall and Mr. Whirlwind Horse.  Mot. 5.  Plaintiffs acknowledge that Mr. Hotz "was not an agent or employee of the United States," Opp'n 1, but nevertheless maintain that the United States is liable under the Fort Laramie Treaty for Mr. Hotz's actions.

The primary jurisdictional question presented in this case is whether a "non-Indian," Compl. ¶ 7, private individual who is not an agent, employee, representative, servant, or individual acting in any other capacity for or on behalf of the United States is a "bad man" "among the whites, or among other people subject to the authority of the United States" under the Fort Laramie Treaty, 15 Stat. at 635, such that plaintiffs present a claim based upon a money-mandating source under which the government must compensate them for the losses they

7

sustained. Whether a Native American can bring an action under the Fort Laramie Treaty for money damages against the United States based upon a "wrong" committed solely by persons who possess no affiliation with the government appears to be an issue of first impression. As explained below, the Fort Laramie Treaty does not confer upon the Court of Federal Claims jurisdiction to entertain such claims.

### A. The Fort Laramie Treaty Represents an Effort to End Armed Conflict Between Native Americans and the United States

In 1867, Native American tribal leaders, as well as members of the United States military and other officials, testified before a joint special committee chaired by Senator James R. Doolittle of Wisconsin ("Doolittle Commission") that was charged with inquiring into the condition of Native American tribes. The Doolittle Commission ultimately issued a report, Condition of the Indian Tribes, containing statements and testimony that, among other things, (1) indicated the extent to which government officials deemed Native Americans inferior, see, e.g., S. Rep. No. 39-156, at 15 (1867) (critiquing the nature of Native American society), 134 (opining that educating Native Americans would facilitate coexistence with "whites"), 427 (recommending that the War Department manage Native American affairs because Native Americans both feared and respected the military), and (2) described the extent to which interactions between United States soldiers and Native Americans adversely affected tribes, see, e.g., id. at 5 (describing the spread of measles, small pox, syphilis, and other sexually transmitted diseases), 7 (noting that "military posts among the Indians have frequently become centers of demoralization and destruction to the Indian tribes"), 426 (documenting the spread of alcoholism among tribes), 469 (opining that, through interactions with the "white man," Native Americans were exposed to vice).

The Doolittle Commission observed that "useless wars with the Indians," id. at 10, could "be traced to the aggressions of lawless white men, always to be found upon the frontier," id. at 5. The "lawless white men" to which The Condition of the Indians referred were apparently United States soldiers, who engaged in the "indiscriminate slaughter of men, women, and children . . . ." Id.; see also id. at 5-6 (noting that soldiers embarked upon a "wholesale massacre" of Native Americans while they "believed themselves to be under the protection of our flag"), 29 (noting that "officers . . . killed and butchered all they came to"), 53 (describing a massacre by soldiers of a Native American village comprised predominately of women and children), 57 (describing in graphic detail the murder and mutilation by soldiers of Native American women and children), 59 (noting that a battle erupted after several Native Americans "were suddenly confronted by a party of United States soldiers"), 93 (recounting an incident between a Native American and a soldier, the latter of whom "pulled out his revolver, fired and broke the Indian's arm"), 96 (recalling that soldiers shot and killed a six year-old girl who presented a "white flag on a stick" during a battle), 371 ("The soldiers are very drunken and come to our place . . . they run after our women and fire into our houses and lodges . . . ."). Consequently, the Doolittle Commission recommended that Congress establish five boards of inspection of Native American affairs that would, among other things, inquire into conduct of the

military toward tribes in order to "preserve peace and amity." Id. at 8.

> In its report, the Peace Commission observed:
>
> In making treaties it was enjoined on us to remove, if possible, the causes of complaints on the part of the Indians.  This would be no easy task.  We have done the best we could under the circumstances . . . .  The best possible way then to avoid war is to do no act of injustice.  When we learn that the same rule holds good with Indians, the chief difficulty is removed.  But it is said our wars with them have been almost constant.

Report to the President by the Indian Peace Commission, January 7, 1868, supra note 3, at 42.  The Peace Commission acknowledged that "[m]any bad men are found among the whites," id. at 36, an observation also expressed by the Doolittle Commission, which noted that it was "difficult if not impossible to restrain white men, especially white men upon the frontiers from adopting [savage] warfare against the Indians," S. Rep. No. 39-156, at 5.  Ultimately, the Fort Laramie Treaty was intended to address the myriad problems documented by the Doolittle Commission.  See Elk v. United States, 87 Fed. Cl. 70, 80 (2009).

### B. The First "Bad Men" Clause in the Fort Laramie Treaty Addresses "Wrongs" Committed by Individuals Affiliated With the United States

Neither the Fort Laramie Treaty nor any "legislative history" related thereto defined the meaning of "whites, or among other people subject to the authority of the United States."  As discussed above, The Condition of the Indians documented numerous instances of humiliation, abuse, and murder of Native Americans by United States soldiers, and it suggested that this conduct was responsible for armed conflict: "[T]he blunders and want of discretion of inexperienced officers in command have brought on long and expensive wars . . . ."  S. Rep. No. 39-156, at 7.  Nevertheless, the Federal Circuit opined that

> the "bad men" provision is not confined to "wrongs" by government employees.  The literal text of article I and the "legislative history" of the treaty show that any "white" can be a "bad man" plus any nonwhite "subject to the authority of the United States," whatever that means, but most likely Indian non-members of the . . . tribe but subject to United States law.

Tsosie, 825 F.2d at 400.  Plaintiffs invoke this language to support their argument that the federal government is liable for Mr. Hotz's conduct without regard to his status.

Reliance upon this language as the basis for the court to assert jurisdiction over a Fort Laramie Treaty-based claim seeking damages for a "wrong" committed by an individual not affiliated with the United States, however, is problematic.  First, the individual who committed the alleged "wrong" in Tsosie, as discussed below, was an employee of a United States hospital

9

facility located within the boundaries of a Navajo reservation. Id. at 397. In light of that fact, the Federal Circuit opined that liability was "not confined" to an employer-employee relationship between the United States and the alleged "bad man." Id. at 400. Here, no relationship, whether employer-employee or otherwise, existed between Mr. Hotz, the alleged "bad man," and the United States. Second, as discussed below, the Federal Circuit's observation was not essential to its analysis of the narrow issue presented before it on appeal, thereby rendering it dictum. Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1307 (Fed. Cir. 2004). Third, the Federal Circuit never explicated the meaning or scope of the clause. To the contrary, the Federal Circuit expressly noted ambiguity: "The literal text of article I and the 'legislative history' of the treaty show that any 'white' can be a 'bad man' plus any nonwhite 'subject to the authority of the United States,' whatever that means . . . ." Tsosie, 825 F.2d at 400 (emphasis added) (quoting 15 Stat. at 635). As such, the court cannot conclude that it possesses jurisdiction in this case based solely upon the Federal Circuit's observation. Instead, the court addresses other decisions involving the "bad men" clause in order to ascertain the nature of claims brought thereunder and how those claims have been adjudicated.

### 1. Courts Have Reached the Merits of Claims Alleging That "Wrongs" Were Committed by "Bad Men" Who Were Subject to the Authority of the United States

Cases involving "bad men" clauses in various 1868 treaties with Native American tribes can be traced to the late nineteenth century. Yet, these early cases did not involve claims by Native Americans seeking damages based upon alleged wrongs committed by non-Native Americans. See, e.g., Janis, 32 Ct. Cl. at 407 (involving a claim by a "squaw man," a citizen of the United States who had been adopted into a Native American tribe, alleging that members of the tribe stole his property); Friend v. United States, 29 Ct. Cl. 425 (1894) (involving a claim by a non-Native American for destruction of property by a Native American); Ex parte Kan-gi-shun-ca, 109 U.S. at 557 (concerning the murder of a Native American member of the Brule Sioux by a member of the same tribe). It was not until 1970 that a case was brought in federal court by a Native American invoking the first "bad men" clause of an 1868 treaty. See Hebah, 428 F.2d at 1334.

In Hebah, the administratrix of her husband's estate brought suit seeking to recover damages after her husband, a member of the Shoshone tribe, was allegedly killed in his residence on the reservation by an Indian Police Force officer. Id. at 1336. In its initial ruling, the Court of Claims denied the government's motion to dismiss, holding that Article I of an 1868 treaty with the Eastern Band of Shoshonees and Bannack Tribe of Indians conferred upon individual Native Americans the right to sue as third-party beneficiaries. Id. at 1340. Although it noted that the officer and alleged "bad man" was a Native American, the Court of Claims explained that the treaty applied to both "whites" and "other people subject to the authority of the United States." Id. Since "[m]embers of the Indian Police Force [we]re appointed by and subject to the Department of the Interior," id. (citing 25 C.F.R. §§ 11.301-.306 (1968)), the officer was subject to the authority of the United States and the plaintiff could invoke the treaty's relevant "bad men" clause. Id. The Court of Claims then remanded the case for a merits ruling by a trial

commissioner, id. at 1334, who ultimately denied the plaintiff relief.[5] On appeal from that determination, the Court of Claims adopted both the findings and opinion of the trial commissioner.  Hebah, 456 F.2d at 698.

The Court of Claims addressed another 1868 treaty claim in Begay, 219 Ct. Cl. at 599, and Begay v. United States, 224 Ct. Cl. 712 (1980).  In that case, eleven female minors and members of the Navajo Nation brought a claim seeking damages for alleged sexual misconduct perpetrated by male teachers and other employees at a school administered by Interior's Bureau of Indian Affairs ("BIA").  Begay, 219 Ct. Cl. at 600.  Most of the allegations involved a "white, non-Indian" counselor, though "two Navajos on the school faculty [were] also said to have been involved in some of the incidents."  Id. at 600 n.1.  Since the alleged "bad men" were employees of the school, no issue was raised as to whether they were subject to the authority of the United States.  Indeed, the Court of Claims "assume[d], without deciding, that the treaty g[ave] plaintiffs a cause of action . . . ."  Begay, 224 Ct. Cl. at 714.

In its first ruling, the Court of Claims denied the government's motion to dismiss for failure to exhaust administrative remedies and stayed proceedings in order to permit Interior to render a decision on plaintiffs' applications for relief filed pursuant to Article I of the treaty.  Begay, 219 Ct. Cl. at 602-03.  Thereafter, an administrative hearing was convened, the hearing officer recommended denying the claims due to lack of proof, and Interior adopted that recommendation.  Begay, 224 Ct. Cl. at 714.  In its second ruling, the Court of Claims determined that the plaintiffs provided no basis upon which to find that Interior's denial of their Article I treaty claim was arbitrary and capricious, unsupported by substantial evidence, or contrary to law.[6]  Id. at 716.

The Federal Circuit, in Tsosie, addressed a narrow issue certified to it by the United States Claims Court ("Claims Court"): whether the relevant "bad men" clause in an 1868 treaty had been rendered obsolete.  825 F.2d at 394-95.  The plaintiff, a Navajo patient at the United States Public Health Service Hospital located within the Navajo reservation, alleged that a hospital employee posed as a physician and conducted an unauthorized medical examination on her body.  Id. at 397.  The plaintiff filed a claim under the relevant "bad men" clause of the 1868

---

[5] The trial commissioner never reached the question of whether the officer was a "bad man," determining instead that the officer's use of force was, under the circumstances, within reason and did not constitute a "wrong" under the treaty.  Hebah, 456 F.2d at 710.

[6] The Court of Claims also explained that the plaintiffs failed to exhaust their administrative remedies, Begay, 224 Ct. Cl. at 715, noting that the plaintiffs' counsel did not (1) properly raise or preserve objections, (2) submit proposed findings, (3) provide comments to the decision for transmission to Interior, or (4) request additional time to prepare for the hearing, id. at 716.  It explained: "All told, these multiple derelictions amount to a virtual failure to prosecute, particularly when plaintiffs' are demanding over 10 million dollars of the taxpayers' funds."  Id.

11

treaty with Interior, which adopted the position that Article I of the treaty was obsolete. Id. Consequently, Interior denied the plaintiff's claim without reaching the merits. Id. The plaintiff sued in the Claims Court, and the government moved to dismiss plaintiff's complaint for failure to state a cause of action or, in the alternative, for summary judgment based upon an obsolescence theory. Id. The Claims Court denied the motion and certified the question of obsolescence to the Federal Circuit, id., which construed the government's theory as a merits-based defense and not a jurisdictional challenge:

> The theory, incidentally, is we believe a matter of defense to be asserted by the government, not a matter of subject-matter jurisdiction. If, e.g., an allegation that a government contract supports a claim suffices for section 1491 jurisdiction, if the contract expired before the claim under it accrued, that is not a matter of subject-matter jurisdiction, but of the merits. Thus the Court of Claims was under no duty to consider sua sponte the alleged obsolescence of article I.

Id. at 398. The Federal Circuit ultimately held that the relevant "bad men" clause, "even if infrequently invoked, has not become obsolete or been abandoned or preempted in any sense that affects its enforceability by suit . . . under the Tucker Act." Id. at 394 (citation omitted); see also id. at 399 ("Prolonged nonenforcement, without preemption, does not extinguish Indian rights."). Accordingly, the Federal Circuit affirmed the Claims Court's ruling and remanded for further proceedings on the merits. Id. at 403.

In Elk v. United States, the plaintiff, a female living on the Pine Ridge Indian Reservation, alleged that a staff sergeant in the Army Recruiting Command, a United States Army ("Army") employee, sexually assaulted her during her recruitment process.[7] 70 Fed. Cl. at 405. The plaintiff submitted two claims to Interior, an administrative claim and a treaty claim. Id. at 406. Interior transferred the administrative claim to the Army, which denied the claim, but the treaty claim remained pending at the time she filed suit in the Court of Federal Claims. Id. The government moved to dismiss for lack of subject matter jurisdiction, asserting that the plaintiff failed to exhaust her administrative remedies. Id. The court, explaining that "nothing in the Sioux Treaty indicates that a claimant must await a decision from Interior before filing suit," denied the motion.[8] Id. at 407. Following a trial on the merits, the court awarded money

---

[7] The United States Department of Justice declined to prosecute the staff sergeant. Elk, 70 Fed. Cl. 405, 406 (2006).

[8] Citing precedent indicating that individual interests could outweigh countervailing institutional interests favoring exhaustion, the Elk court noted that Interior "failed to prescribe procedures for considering 'Bad Men' claims, but, most importantly, has not established any fixed time within which to consider those claims." 70 Fed. Cl. at 409. The Elk court ultimately reached the opposite conclusion set forth in Zephier v. United States, No. 03-768 (Fed. Cl. Oct. 29, 2004) (unpublished decision). In Zephier, the Court of Federal Claims granted the government's motion to dismiss for failure to exhaust administrative remedies. Id. at 4.

damages to the plaintiff.  See Elk, 87 Fed. Cl. at 70.

### 2. Courts Have Dismissed Claims Failing to Allege That "Wrongs" Were Committed by Individual "Bad Men" Who Were Subject to the Authority of the United States

Courts have also encountered–and dismissed–several claims brought by plaintiffs alleging that federal entities committed wrongful acts and were therefore "bad men" under Native American treaties.  In Garreaux, an elderly Native American woman sought damages for breach of a lease agreement by the Cheyenne River Housing Authority ("CRHA"), which had entered into a twenty-five year lease agreement with Native American heirs to land held in trust for them by the federal government.  77 Fed. Cl. at 727-28.  The lease agreement was approved by the BIA, and the land was to be used to build a home using financial assistance provided by the United States Department of Housing and Urban Development.  Id. at 728.  The CRHA entered into a Mutual Help and Occupancy Agreement ("MHOA") with the plaintiff, who believed that she would own the house upon the completion of the MHOA.  Id.  Although the plaintiff fulfilled her obligations under the MHOA, the BIA informed her that the lease was terminated and that she would be required to vacate her home.  Id.

The court acknowledged that "there is little doubt that [it] has jurisdiction of a proper claim brought under the 'bad men' provision of Article 1 of the Fort Laramie Treaty of April 29, 1868, between the United States and the Great Sioux Nation."  Id. at 735 (emphasis added).  Nevertheless, it determined that "the primary intent of both 'bad men' provisions was to guard against affirmative criminal acts, primarily murder, assault, and theft of property."  Id. at 736.  Because cases involving the "bad men" clause "have similarly been criminal in nature," the court dismissed the complaint for lack of jurisdiction because the plaintiff asserted a breach of contract or negligence claim against a federal agency, not a claim against an individual affiliated with the United States for a wrongful criminal act.  See id. at 737.

The Court of Federal Claims also dismissed for lack of jurisdiction a complaint alleging that the United States District Court for the District of Nebraska and a member of a non federal agency conspired to, among other things, violate the plaintiff's civil rights during the course of criminal proceedings that resulted in his conviction and incarceration.  Hernandez, 93 Fed. Cl. at 195-96.  According to the plaintiff, the United States breached the Fort Laramie Treaty by failing to arrest purported wrongdoers, including a federal district court and a Western Intelligence Narcotics Group ("WING") officer who allegedly bribed a witness.  Id. at 198.  Granting the government's RCFC 12(b)(1) motion, the court noted that the plaintiff "allege[d] no acts that would have threatened the peace that the Fort Laramie Treaty was intended to protect."  Id. at 199.  A federal district court, the Court of Federal Claims explained, was "not a specified white

---

Exhausting administrative remedies, the court reasoned, "would contribute to judicial efficiency by allowing the responsible agency to make a factual record, apply its expertise, and correct its own errors so as to moot judicial controversies."  Id. at 14 (citing Parisi v. Davidson, 405 U.S. 34, 37 (1972)).

man," id., and the claims against that entity did not qualify as "wrongful acts" under the Fort Laramie Treaty, id. at 200 n.7. Moreover, the court noted that WING was not a federal agency. Id. at 200 (citing G-Lam Corp. v. United States, 227 Ct. Cl. 764, 764 (1981)). Thus, the court explained, even if the WING officer had committed a wrongful act, he was "not an agent of the United States, and thus the Court of Federal Claims [could] not assert jurisdiction over plaintiff's claims under the 'Bad Men' clause." Id.

### C. Plaintiffs' Claim Does Not Fall Within the Scope of the Fort Laramie Treaty

The primary purpose of the Fort Laramie Treaty was to end armed conflict and preserve amity between Native American tribes and the United States. See supra Part III.A; see also Janis, 32 Ct. Cl. at 409 (explaining that the "general purpose of the Indian indemnity acts . . . was to keep the peace"); Hernandez, 93 Fed. Cl. at 199 (noting that the Fort Laramie Treaty was intended to preserve peace). Plaintiffs do not allege that Mr. Hotz, a "non-Indian," Compl. ¶ 7, was "subject to the authority of the United States," 15 Stat. at 635, i.e., that Mr. Hotz was an agent, employee, representative, servant, or individual acting in any other capacity for or on behalf of the United States at the time of the incident that resulted in the deaths of Ms. Randall and Mr. Whirlwind Horse.[9] See Slattery, 2011 WL 257841, at *9 n.3 (requiring that a breaching entity be "part of the federal government" or "acting as its agent" in order to assert Tucker Act jurisdiction); cf. Compl. ¶ 7 (alleging that Mr. Hotz was the "former operator of a retail grocery store at White Clay, Nebraska"). Furthermore, although plaintiffs allege that Mr. Hotz was prosecuted and is currently incarcerated, they do not allege that Mr. Hotz's conduct was of the nature that constituted a breach by the United States of its obligation to maintain peace with the Oglala Sioux Tribe.

A common thread is discernible from Hebah, Begay, Tsosie, Elk, and Hernandez: the court possesses jurisdiction over Article I "bad men" clause claims where there exists a nexus between the individual committing the alleged "wrong" and the United States. See also Zephier, slip. op. at 9 ("The Sioux Treaty, like others, clearly states that the United States will both arrest a non-Native American government representative who harms a Sioux or his property and reimburse the damages sustained by the claimant . . . ." (emphasis added)). In each of these cases, the alleged "bad men" were individuals–whether "white" or "other people"–who were "subject to the authority of the United States" in some capacity.[10] See, e.g., Tsosie, 825 F.2d at 397 (involving a United States Public Health Service Hospital employee); Begay, 219 Ct. Cl. at 599 (involving teachers, both white and Native American, who were employed at a BIA school);

---

[9] Because the court assumes all factual allegations are true and draws all reasonable inferences in the plaintiffs' favor, the court deems plaintiffs' allegation that Mr. Hotz was a "non-Indian" to mean that he was "white."

[10] Although it is unclear who the "bad men" were in Zephier, the plaintiffs alleged that the "wrongs" to which they were subjected occurred while they attended educational institutions that were overseen by Interior. Slip op. at 2.

Hebah, 456 F.2d at 696 (involving an Indian Police Force officer who was subject to the authority of Interior); Elk, 70 Fed. Cl. at 406 (involving an Army staff sergeant). A claim alleging that an individual not affiliated with the United States committed "wrongs" against Native Americans was dismissed for lack of subject matter jurisdiction. See Hernandez, 93 Fed. Cl. at 200 (involving an officer who was employed by WING, a non-federal agency).

Waivers of sovereign immunity, including the Tucker Act, must be narrowly construed. Radioshack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009). Plaintiffs do not explain how their broad conception of the government's liability under the relevant "bad men" clause is sustainable under this principle of statutory construction. Although "Indian treaties are to be interpreted liberally in favor of the Indians," Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 200 (1999), courts are not bound by the interpretation of a treaty advanced by a tribe or tribal member in support of litigation. Plaintiffs' interpretation yields an absurd result and imposes upon the federal government an impossible task: to guarantee the safety and tranquility of all Native Americans on reservations during any and all of their interactions with anyone. Such an interpretation is unsustainable, and it is contrary to the limitations the parties recognized at the time they negotiated the Fort Laramie Treaty. See S. Rep. No. 39-156, at 5 (acknowledging the difficulty, if not impossibility, of restraining all white men from engaging in armed conflict with Native Americans). It is apparent that the United States assumed a limited obligation when it negotiated the Fort Laramie Treaty: to ensure that an identifiable class of individuals who acted as agents, employees, representatives, servants, or in any other capacity for or on behalf of the United States, viz., "people subject to the authority of the United States," 15 Stat. at 635 (emphasis added), maintained the peace between the United States and the Sioux Nation, see Report to the President by the Indian Peace Commission, January 7, 1868, supra note 3, at 5. Accordingly, the court holds that, in order to invoke jurisdiction under the first "bad men" clause contained in Article I of the Fort Laramie Treaty, a plaintiff must allege a "loss" that resulted from a "wrong" committed by a "bad man" who was "subject to the authority of the United States," i.e., an individual who acted as an agent, employee, representative, servant, or in any other capacity for or on behalf of the United States.

That the United States is liable solely for the conduct of individuals associated therewith or acting on its behalf is consistent with cases alleging the existence of an enforceable contract with the government. A breach of contract action against the government cannot be maintained absent actual authority by an agent of the United States to bind the government, Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); see also id. ("Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains . . . even when the Government agents themselves may have been unaware of the limitations of their authority."), and no liability attaches absent such authority. Just as the United States may not be held liable for any alleged breach of contract that may have been executed in the absence of an agent's authority to bind the government, so, too, can the United States not be held liable for any "wrong" committed by any "bad man" who does not act on behalf of or represent the United States. See Slattery, 2011 WL 257841, at *9 n.3.

15

Plaintiffs do not allege that Mr. Hotz was an agent, employee, representative, servant, or individual acting in any other capacity for or on behalf of the United States at the time of the tragic incident that killed Ms. Randall and Mr. Whirlwind Horse.  Despite their profound loss, plaintiffs have not alleged that they are within the class of plaintiffs–Native Americans who sustained losses as a result of a "wrong" committed by a "bad man" who acted in a capacity for or on behalf of the United States–entitled to recover under the relevant "bad men" clause of Article I of the Fort Laramie Treaty.  See Jan's Helicopter Serv., Inc., 525 F.3d at 1309.  Accordingly, plaintiffs cannot invoke jurisdiction under the Tucker Act.  See Slattery, 2011 WL 257841, at *9 n.3.  Because the court lacks subject matter jurisdiction over the complaint, defendant's motion to dismiss pursuant to RCFC 12(b)(1) is granted.[11]

### IV.  CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is **GRANTED**.  The clerk is directed to **DISMISS WITHOUT PREJUDICE** the complaint for lack of subject matter jurisdiction and to enter judgment.  No costs.

**IT IS SO ORDERED.**

                                                   s/ Margaret M. Sweeney
                                                   MARGARET M. SWEENEY
                                                   Judge

---

[11]  In light of its jurisdictional ruling, the court need not address the arguments raised in defendant's RCFC 12(b)(6) motion concerning the nature of the "wrong" contemplated by the Fort Laramie Treaty.